**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| MITCH CARLSON<br>　　　*Plaintiff*,<br><br>　　　v.<br><br>CLAY SIGNOR, JOHN CREIGHTON, III<br>and JOHNNIE MELVIN<br>　　　*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>　Civil Action No.: 25-2081<br><br>　Demand For Jury Trial |

## COMPLAINT

Plaintiff, MITCH CARLSON ("Plaintiff"), files his Complaint for defamation against Defendants CLAY SIGNOR, JOHN CREIGHTON, III and JOHNNIE MELVIN ("Defendants"), alleges as follows:

## INTRODUCTION

1. Mitch Carlson, the CEO and Chairman for Green Corridors International, Inc., was wrongly blamed by Defendants for a fraudulent $50 MM "purchased goodwill" entry in Green Corridors' financial statements. Defendants used Mr. Carlson as a scapegoat for their fraudulent conduct, which was ultimately confirmed by an independent investigation, but the fallout from Defendants' conduct was devastating to Mr. Carlson.

2. Almost overnight, Mr. Carlson went from successfully running two companies to dedicating all of his time and energy to defending himself from false accusations and redressing the harm Defendants caused to his reputation, harm that also permeated to the companies. Defendants acted with malice and are financially responsible for the harm they have caused Mr. Carlson.

1

## THE PARTIES

3. Plaintiff Mitch Carlson is an individual and a citizen of Lake Country, British Columbia.

4. Defendants Clay Signor, John Creighton, and Johnnie Melvin (the "Defendants") are all citizens of Texas.

5. Defendant Clay Signor is an individual and a citizen of Texas, residing at 401 N. Pine St., Fredericksburg, TX 78624-4335, Gillespie County, or wherever else he may be found.

6. Defendant John Creighton, III is an individual and a citizen of Texas, residing at 7600 County Road 272, Bertram, TX 78605-3895, Burnet County, or wherever else he may be found.

7. Defendant Johnnie Melvin is an individual and citizen of Texas, residing at 319 Mountain Laurel Way, Austin, TX 78737-4565, Hays County, or wherever else she may be found.

## JURISDICTION AND VENUE

8. This Court has jurisdiction under 28 U.S.C. § 1332 because Mr. Carlson, as plaintiff, is not a citizen of the same state as the defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Venue is proper in this division and district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in the Austin Division of the Western District of Texas.

## FACTUAL ALLEGATIONS

### A.   *Mitch Carlson and Green Corridors.*

10. The Plaintiff, Mitch Carlson, is a successful entrepreneur and CEO of two global industrial technology companies, co-founder of a prior wellhead technology company, and recognized as a 2019 EY Entrepreneur of the Year nominee.

11. On March 31, 2023, Green Corridors International, Inc., f/k/a Green Corridors, LLC, f/k/a Elevated Freight Technologies, LLC ("Green Corridors") was formed, with Mr. Carlson as CEO. Green Corridors is an innovative, private infrastructure company building an elevated, autonomous freight shuttle system on the US / Mexico border.

12. Defendant Clay Signor was Chairman of the board and the largest shareholder of Green Corridors.

13. Defendant Johnnie Melvin is a CPA and the CEO of HS Business Services, LLC ("HSBS"), a company owned by Clay Signor. At the direction of Clay Signor, Green Corridors used HSBS as its accounting and bookkeeping service.

14. Defendant John Creighton was Green Corridors' attorney, but as later discovered, also acted as Clay Signor's personal attorney.

### B.   *Discovery of the Erroneous $50MM Goodwill Entry.*

15. A little over a year after Green Corridors was formed, while Green Corridors was preparing for its conversion to a C-corp., tax counsel and management inquired about an entry in Green Corridors' 2023 financial statements indicating a $50 million asset characterized as "purchased goodwill" on the balance sheet (the "Goodwill Entry").

16. Immediately after discovering the Goodwill Entry, management, including Mr. Carlson, earnestly sought to find the origin of the Goodwill entry. During this time, Defendants

3

hid their knowledge of the origin of the Goodwill Entry and in fact conspired to pin the matter on Mr. Carlson. Green Corridors hired Cleveland Krist, PLLC ("CK") to perform a full investigation into the origin of the Goodwill Entry.

17. Ultimately, several months later, CK determined that Defendants were the source of the unsubstantiated Goodwill Entry, and subsequently collaborated to mislead and misinform the board, using Mr. Carlson as their scapegoat for the Goodwill Entry. Even though Mr. Carlson was vindicated, Defendants' accusations and conduct over the next few months of CK's investigation caused reputational damage Mr. Carlson is still redressing.

      **C.**    *Defendants use Mr. Carlson as their Scapegoat for the Goodwill Entry.*

18. After discovering the Goodwill Entry, Green Corridors, including Mr. Carlson, sought to determine the source of the Goodwill Entry and in doing so conducted their own internal investigation and separately commissioned CK to conduct a full investigation. A fraudulent $50MM entry in Green Corridors financial statements stood to severely disrupt relationships with investors and partners.

19. During both the company's internal investigation and CK's separate investigation, rather than disclosing the truth behind the Goodwill Entry, Defendants worked together to obfuscate the investigation and mislead CK and Green Corridors by stating that Mr. Carlson was the reason for the Goodwill Entry.

20. On December 19, 2024, Defendant Clay Signor emailed members of the Board of Green Corridors, including Mr. Carlson, and others purporting to have uncovered new information:



*See* Exhibit 1 (true and correct copy of December 19, 2024, 10:40 a.m. email from Clay Signor).

21. The attachment to this email was a scanned PDF of what was guised as a "draft" email authored by Defendant John Creighton and purportedly intended to go to Defendant Clay Signor and Gates Walcott, stating "that number was developed by Mitch Carlson and communicated to Johnnie Melvin and me":



5

*See* Exhibit 1 at attachment.

22. While the thought process behind printing out, handwriting the word "draft" on and scanning this "draft" email may not be known, it is now clear that in his December 19 email Clay Signor was trying to pass this "draft" email off as evidence to frame Mr. Carlson, all while feigning cooperation with the company's investigation.

23. Minutes later, on December 19, Clay Signor followed through on his promise to forward more emails "discovered by Johnny [*sic*]" (referring to Defendant Johnnie Melvin) under the guise of providing the company with more information relevant to the investigation. *See* Exhibit 2 (true and correct copy of December 19, 2024, 11:09 a.m. email from Clay Signor). One of these emails "discovered by Johnn[ie]" was one of her own from several months before, dated February 14, 2024, where she had unequivocally stated to Hugh Hartzog (VP of Finance for Green Corridors) and David Leininger (CFO of Green Corridors) that "The $50M Goodwill number came from Mitch." *See* Exhibit 2 at 3-4 (true and correct copy of February 14, 2024, 2:05 p.m. email from Johnnie Melvin).

24. Significantly, Johnnie Melvin had excluded Mitch from the February 14 email to Green Corridors' VP of Finance and CFO, thereby preventing him from being able to defend himself against the false accusation. Johnnie Melvin's duplicity and malice in her conduct towards Mr. Carlson is evidenced by the fact that *four hours later*, Johnnie Melvin emailed Mr. Carlson and Green Corridors' outside counsel in a *separate* email thread (as though she had not just falsely accused Mitch of having fabricated the Goodwill Entry hours earlier) stating, "On the Goodwill, $179K of it was for Mr. Carlson's initial assigned value. Mitch or Clay may know where the $50M came from – I'm not sure." *See* Exhibit 3 at 6-7 (true and correct copy of February 14, 2024, 6:41 p.m. email from Johnnie Melvin). Mr. Carlson had no way of knowing that just four hours before,

6

in a *separate* email, Johnnie Melvin had told the CFO and VP of Finance of Green Corridors that "The $50MM Goodwill number came from Mitch." It was not until eight (8) months later that Mr. Carlson learned that Defendants had used him as a scapegoat during Green Corridors' investigation in a calculated effort to deflect responsibility and accountability for the Goodwill Entry.

25. Despite Defendants' best efforts, Green Corridors ultimately discovered Defendants were the sole cause for the Goodwill Entry. On April 11, 2025, CK issued a report finding, amongst other things:

   a. John Creighton, with Clay Signor copied, directed Johnnie Melvin to add the Goodwill Entry;

   b. No support existed for Defendants' allegation that Mr. Carlson created or provided instruction for the Goodwill Entry;

   c. Defendants failed to disclose the full extent of their knowledge during the investigation; and,

   d. In manufacturing the Goodwill Entry, John Creighton and Johnnie Melvin acted for the benefit of Clay Signor.

26. The CK report confirmed that Defendants, *not Mr. Carlson*, were responsible for the Goodwill Entry. Therefore, *each Defendant knew the source of the Goodwill Entry but still decided to falsely blame Mr. Carlson*.

27. Defendants' statements made during the investigations were false, made with actual malice, and have not only caused Mr. Carlson reputational harm but also have diminished the value of Green Corridors (in which Mr. Carlson held an ownership interest) and severely hindered further efforts to attract investors.

**D.**     *Harm to Mr. Carlson Continues After Investigation Ends.*

28.     Soon after the discovery of the Goodwill Entry, prior to CK issuing its findings, investors of Green Corridors started raising grave concerns about valuations that their investments were based on and even started threatening lawsuits against Green Corridors.

29.     In those months, not only was Mr. Carlson defending his personal reputation, but as the face of Green Corridors, Mr. Carlson was also fighting for the ongoing viability of Green Corridors. Mr. Carlson was also forced to dilute his equity in Green Corridors from his original 12.5% to bring on additional investors due the reputational harm caused to him and the company by Defendants false accusations.

30.     In addition to his role as CEO of Green Corridors, Mr. Carlson was also CEO of another company, Snubbertech Manufacturing ("Snubbertech") during the events surrounding this matter.  Because of Defendants' defamation and associated fall out, Mr. Carlson was forced to disclose the Green Corridors' situation, including Defendants' defamatory statements, to the Snubbertech board so that Mr. Carlson could devote necessary time and attention to defending against the false accusations and attempting to restore the resulting reputational harm.  As a result, Mr. Carlson was unable to devote sufficient time and attention to Snubbertech, forcing Snubbertech to shut down an expansion project Mr. Carlson was anticipated to lead, which resulted in a significant reduction in revenue to Snubbertech and, therefore, Mr. Carlson.

31.     Mr. Carlson is still fighting to restore his reputation and working with his companies to make up the ground he lost while he was defending himself from Defendants' baseless and false accusations against him.

## CAUSES OF ACTION

### Count 1: Defamation

32. Mr. Carlson realleges and incorporates by reference all preceding allegations as though restated here.

33. Defendants made the following false statements of fact:

   a. On December 19, 2024, Defendant Clay Signor forwarded a scanned copy of an alleged "draft" email written by Defendant John Creighton to Gates Walcott, Lori Pickle, Hugh Hartzog, David Leininger, and Jeff Scheferman, of Green Corridors. The "draft" email stated that Mr. Carlson developed the "$50,000,000.00 purchased good will number."

   b. On December 19, 2024, Mr. Carlson learned for the first time that Defendant Johnnie Melvin on February 14, 2024, had stated to Hugh Hartzog, VP of Finance for Green Corridors, and David Leininger, CFO of Green Corridors, that "The $50M Goodwill number came from Mitch."

   c. On information and belief, Defendants Clay Signor, John Creighton, and Johnnie Melvin, made additional statements to at least one or more of Lori Pickle of Dwyer Murphy Calvert LLC, Gates Walcott, Leanne O'Donnell of Dwyer Murphy Calvert LLC, Michael Baxter of Baxter Law Firm, PLLC, and other parties associated with Green Corridors, that Mr. Carlson was the source of the Goodwill Entry.

34. These false statements were republished within Green Corridors and have caused Mr. Carlson to devote substantial time, money, and effort to defend himself from these baseless allegations. Mr. Carlson's compensation and equity in Green Corridors has also diminished as a result of Defendants' conduct.

35. The Statements were statements of fact and directed to Mr. Carlson; they were false and defamatory *per se* because they impugned Mr. Carlson's business reputation (therefore injuring his occupation) and were accusations of having engaged in a crime. Defendants made the statements knowing they were false or, at the very least, with reckless disregard for the truth, and the statements have caused (both by the original publications and the republications) great

9

harm to Mr. Carlson. Damages are also presumed because Defendants statements were obviously harmful to Mr. Carlson professionally and reputationally, constituting defamation *per se*.

36. Defendants *knew* Mr. Carlson had nothing to do with the Goodwill Entry. Defendants intentionally blamed Mr. Carlson for serious, fraudulent conduct that he did not do. Defendants were the ones who came up with the idea for the Goodwill Entry and executed the same within Green Corridors while working together to falsely accuse Mr. Carlson *of their own fraudulent conduct*. Mr. Carlson is a very successful businessman. He currently sits as Chairman and CEO for GCI, sits on the board of Snubbertech, is a member of the Advisory Board of Energy Innovation Capital, and sits on the Board of the Border Trade Alliance Commission. Defendants published the Statements despite their knowledge that the Statements would harm Mr. Carlson, his reputation amongst his peers, and his employability.

37. Before filing this action, demand was made that Defendants retract their defamatory statements. No retraction has occurred.

38. Mr. Carlson seeks actual and punitive damages against Defendants for their conduct.

## JURY DEMAND

39. Mr. Carlson demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

## PRAYER FOR RELIEF

40. Mr. Carlson, therefore, respectfully requests that this Court award damages for (1) Mr. Carlson's loss of reputation; (2) Mr. Carlson's loss of compensation related to his position at Snubbertech; (3) Mr. Carlson's loss in compensation due to the value of his equity in Green

Corridors being diminished because of Defendants' conduct; (4) punitive damages; and (5) for further relief at law or in equity as to which Mr. Carlson may be entitled.

Date:  December 18, 2025.                                      Respectfully submitted,

>                                                              */s/ Tammy Terry*
>                                                              Tammy J. Terry, ***Lead Attorney***
>                                                              tammy.terry@nelsonmullins.com
>                                                              Brittany G. Rupple
>                                                              brittany.rupple@nelsonmullins.com
>                                                              Lisa E. Margonis
>                                                              lisa.margonis@nelsonmullins.com
>                                                              Chance G. Siller
>                                                              chance.siller@nelsonmullins.com
>                                                              NELSON MULLINS RILEY & SCARBOROUGH LLP
>                                                              1111 Bagby Street, Suite 2100
>                                                              Houston, TX 77002
>                                                              Telephone: (346) 646-5389mail:
>
>                                                              ***Attorneys for Plaintiff***